UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DARRELL T. OPPERMANN,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀Civil Action No. 06-1824 (EGS)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
UNITED STATES OF AMERICA,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀Defendant.⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)

**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY
JUDGMENT AND MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

⠀⠀⠀⠀⠀Plaintiff, Darrell T. Oppermann, a former Navy officer, alleges that he was convicted by a

Navy general court-martial in violation of his Constitutional equal protection guarantees insofar

as "fixed terms of office were prescribed for Army and Coast Guard trial and appellate military

judges but not for those of the Navy, Marine Corps, and Air Force." Complaint ¶ 7. Defendant

moved to dismiss Plaintiff's Complaint. In the alternative, Defendant moved for a grant of

summary judgment. Plaintiff filed a cross-motion for summary judgment and opposed

Defendant's motion. Document No. 10 ("Plaintiff's Opposition"). Plaintiff's Complaint should

be dismissed or, in the alternative, Defendant is entitled to a grant of summary judgment.

⠀⠀⠀⠀⠀⠀⠀**RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS**

⠀⠀⠀⠀⠀The parties agree that Plaintiff's claims are legal in nature and susceptible of resolution

by dispositive motion at this stage of the proceedings, since both parties have moved the Court

for summary judgment. Plaintiff includes with his cross-motion, a six-paragraph "Statement of

Material Facts as to Which There is No Genuine Dispute." Document 10. While Plaintiff's

paragraphs one through four are not in dispute, they are not material to the resolution of the jurisdictional arguments in Defendant's motion, which turn on whether Plaintiff can demonstrate that he did not receive "full and fair" consideration of his claims in the military courts. Plaintiff's paragraph five is a legal conclusion or perhaps simply a statement of law.  Plaintiff's paragraph six is his characterization of the referenced decision; the decision itself is the best evidence of its contents.

Plaintiff does not dispute any of the facts set forth in Defendant's Statement of Facts.  <u>See</u> Plaintiff's Statement of Genuine Issues, Document No. 11.  Thus, it is undisputed that pursuant to a plea agreement, a general court-martial composed of a single military judge convicted Plaintiff of dereliction of duty, failure to obey a lawful order, operating a vehicle while drunk, being found drunk on duty, wrongfully and recklessly engaging in conduct likely to cause death or serious bodily harm, and being incapacitated for duty through prior wrongful indulgence in intoxicating liquor, all violations of the Uniform Code of Military Justice ("UCMJ").  <u>See</u> Def. Exhibit A.  Although Plaintiff was the sole nurse anesthetist on duty on September 15, 2002, he drank more than a pint of gin, became drunk, and then continued to treat patients.  Def. Ex. F, attachment B at 2.  Plaintiff was sentenced to nine months confinement, forfeiture of $2,000.00 pay per month for nine months, and dismissal from the Navy.  Compl. at ¶ 9.  The trial court dismissed Plaintiff from the Navy, but suspended his confinement and forfeiture pursuant to a pretrial agreement.  Compl. at ¶ 11.  Thus, it is Plaintiff's dismissal from the Navy that he asks this Court to overturn.

**ARGUMENT**

A.      This Court lacks Jurisdiction Over This Matter Because Plaintiff Received "Full and Fair" Consideration by the Military Courts.

_____Plaintiff urges this Court to strike out and make new law in contravention of decisions of the United States Supreme Court and the settled law of this Circuit.  In its initial Memorandum, the Government explained that, except in a limited class of cases, military court decisions have res judicata effect barring review in the Federal civil courts.  See Schlesinger v. Councilman, 420 U.S. 738, 746 (1975).  Cases such as this one can only go forward in the district court when the underlying military court judgment was "void . . .because of lack of jurisdiction or some other equally fundamental defect."  Id.  See also New v. Rumsfeld (New II), 448 F.3d 403, 408 (D.C. Cir. 2006).

_____The government explained that an issue is deemed to have been given "full and fair consideration," thus avoiding a "fundamental defect," when it has been briefed and argued, even if the military court summarily disposes of the matter.  Watson v. McCotter, 782 F.2d 143, 145 (10th Cir.), cert. denied, 476 U.S. 1184 (1986).  Plaintiff argues that this case is distinguishable from New, in which the Court of Appeals for the Armed Forces (CAAF) issued "a 35-page published opinion."  Pl. Opp. at 7 (citing United States v. New, 55 M.J. 95 (C.A.A.F. 2001)).  Plaintiff's extremely narrow understanding of the relevance of New, hinging upon the number of pages in that decision, does not advance his argument.  New does not hold that a thirty-five page opinion is required for "full and fair" consideration of an issue.  Obviously, the court's treatment of any particular issue depends upon the relative strength or weakness of the arguments for and against the issue and the law supporting those arguments.  In New, the plaintiff challenged an

3

Army order deploying his unit as part of a U.N. Peacekeeping Force and requiring the plaintiff in that case to wear a U.N. helmet and insignia. New's challenge was to the legality of the specific order, whereas Plaintiff raises a general challenge to the system of military justice. Each court gave the litigants, New and Oppermann, the process that they were due given the relative strength of their arguments.

Plaintiff specifically complains that the CAAF denied his petition without "plenary briefing" or "oral argument." Pl. Opp. at 7. Plaintiff argues that the Navy Marine Court of Criminal Appeals (NMCCA) did not hear oral argument in his case, and that its decision was "terse" and relied on cases decided before "the inter-service disparity arose." Id. These arguments can be readily disposed of. First, as explained above, the military courts did give Plaintiff the consideration his argument was due. Second, the military courts previously rejected the same issue presented by Plaintiff in this case in United States v. Gaines, 61 M.J. 689 (NMCCA 2005), affirmed, 64 M.J. 79 (C.A.A.F. 2006). There is no need for argument on an issue when there is controlling precedent on the point and the military courts are entitled to, and must, apply their own precedent. Similarly, the United States Court of Appeals for the District of Columbia Circuit can summarily affirm, or can decide a case without argument pursuant to Circuit Rule 34(j). It does not follow that the appellant in such cases has been denied "full and fair" consideration by the Court of Appeals. On the contrary, the court's rules expressly permit such a disposition. Likewise, in this case there was no need to rewrite the Gaines decision.

Here, Plaintiff has been represented by counsel throughout and his challenge to the appointment process for the military judge who convicted and sentenced him was fully briefed by both Plaintiff and the government. The NMCCA stated clearly that it gave careful consideration

to the briefing and record in the case.  Its decision indicated that it simply did not find the issue meritorious.  It is not this Court's role to conclude otherwise and reject what the military court expressly stated in its decision: that it had given careful consideration to the parties' arguments.

The NMCCA in <u>Gaines</u> held that because the <u>Weiss</u> and <u>Loving</u> decisions found that Congress provided for sufficient Fifth Amendment protections for service members in drafting the UCMJ, and because "Congress has sanctioned distinctions between the services in authorizing each service secretary to prescribe regulations for the manner in which military judges are detailed," <u>Gaines</u>, 61 M.J. at 692, the regulatory differences among the services in assigning military judges do not violate the Constitution.  <u>Id.</u>

Third, the principles established in cases decided prior to the time that the purported "inter-service disparity arose" can still be dispositive of the issues in this case.  The NMCCA cited <u>United States v. Loving</u>, 41 M.J. 213 (C.A.A.F. 1994), and the Supreme Court's decision in <u>Weiss v. United States</u>, 510 U.S. 163 (1994).  The mere fact that the cited cases preceded the purported "disparity" is irrelevant if the principles relied upon in those cases resolve this case, as they do.  For example, the Supreme Court, in <u>Weiss</u>, stated that "the applicable portions of the UCMJ, and corresponding regulations, by insulating military judges from the effects of command influence, sufficiently preserve judicial impartiality so as to satisfy the Due Process Clause." <u>Weiss</u>, 510 U.S. at 179.

Plaintiff complains that <u>certiorari</u> review to the United States Supreme Court is not available to him.  Pl. Opp. at 9 (citing 28 U.S.C. § 967a(a)).  That was Congress' decision, which Plaintiff asks this Court to ignore.  In fact, the clear signal from Congress is that the military courts are sufficient and can competently handle Constitutional issues.  As the Supreme Court

observed in <u>Schlesinger</u>, "congressional judgment must be respected and that it must be assumed that the military court system will vindicate the [service members'] constitutional rights." <u>Schlesinger</u>, 420 U.S. at 758.

The Court of Appeals has indicated that the military court decisions would have <u>res judicata</u> effect, and thus that relief would be barred, "unless the judgments were 'void.'" <u>New v. Rumsfeld</u>, 448 F.3d 406. In response, Plaintiff argues that his Constitutional argument is important, Opp. at 5-6. In addition, Plaintiff claims that terms of office for military judges "cut to the heart of the legal process" and are "at least pertinent to judicial independence." Pl. Opp. at 6. Assuming <u>arguendo</u> that the issue may be pertinent to judicial independence,[1] <u>Weiss</u> held that there are sufficient other protections in the UCMJ to ensure that independence, so the lack of fixed terms of office does not, in fact, "cut to the heart of the legal process." <u>Weiss</u>, 510 U.S. at 179-80.

B.    <u>The Navy Is Entitled to a Grant of Summary Judgment on the Merits Because the Lack of Fixed Terms of Office for Navy Military Judges Does Not Violate the Constitution.</u>

Plaintiff argues that the Court should assess the purported "inter-service disparity" under the extremely deferential rational-basis standard of review. Pl. Opp. at 10. Plaintiff does not allege that the judges who presided over his case at the trial and appellate level were biased or acted improperly. <u>Id</u>. Instead, just as in <u>Weiss</u>, Plaintiff asks the Court to <u>assume</u> that the alleged "inter-service disparity" prevents military judges from being impartial in addressing service members' claims. <u>See Weiss</u>, 510 U.S. at 179; Pl. Opp. at 10. Plaintiff seems to have ignored

---

[1] This is an assumption that the Supreme Court's <u>Weiss</u> decision seriously undermines in its discussion of military judges' independence. <u>Weiss</u>, 510 U.S. at 179.

that an even more deferential standard than rational-basis review applies to questions previously decided by the military courts. The Supreme Court explained that the test is "whether the factors militating [against the practice] are so weighty as to overcome the balance struck by Congress." Weiss, 510 U.S. at 179 (quotations omitted). Nonetheless, the Navy's system for the tenure of its judges easily meets even the rational-basis standard of review. After all, "Congress did not even create the position of military judge until 1968 . . . Courts-martial thus have been conducted in this country for over 200 years without the presence of a tenured judge, and for over 150 years without the presence of any judge at all." Id.

Plaintiff argues that after Weiss, the Army and Coast Guard adopted fixed terms, while the Navy did not. Pl. Opp. at 11. He explains that the Navy "changed [its] mind along the way." Pl. Opp. at 11. That concession alone shows that the Navy's decision meets the standards for rational-basis review. If it changed its mind, obviously, the Navy had reasons for its decision. The government explained what some of those potential reasons might be in its initial Memorandum, based upon the needs and nature of their unique military organizations. Moreover, there is nothing in the Weiss decision that indicates that having a fixed term of office, or the alleged disparity between the services in this regard, violates the Constitution's due process or equal protection guarantees.

In the face of this settled law, Plaintiff argues that given Weiss, once the government provided some military judges with fixed terms of office, it had to provide all military judges with fixed terms. Pl. Opp. at 12. This assumes a much higher level of Constitutional scrutiny than rational basis, since under rational-basis review, any potential reason is sufficient to sustain the action. Plaintiff also assumes that there is a problem with the lack of fixed terms, but Weiss

7

demonstrates that there is not.  To run afoul of Constitutional Equal Protection guarantees, the government must treat persons differently in a manner that has Constitutional significance.  For example, the color and style of uniforms is different as between the services: there obviously is no requirement of exact uniformity.  Plaintiff states at the bottom of page 10 that "The UCMJ itself obviously favors uniformity."  This is true only in a general sense.  Congress specifically allowed for disparities among the services, for example in allowing each Service Secretary to promulgate their own regulations.

Under the extremely deferential rational basis standard of review, the Court must uphold government action "if there is any reasonably conceivable state of facts that could provide a rational basis for the" action or classification.  FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993) (emphasis added).  That standard is the "paradigm of judicial restraint."  Id.  See also United States R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 179 (1980) (same); BellSouth Corp. v. FCC, 162 F.3d 678, 691 (D.C. Cir. 1998) (same).  Under this standard of review, government actions bear "a strong presumption of validity" and Plaintiff has the burden to negate "every conceivable basis which might support it."  Beach Communications, 508 U.S. at 314-15 (citations omitted).  So long as the reviewing court can conceive of facts which reasonably justify the action at issue, that action survives rational basis review.  Id. at 315.

Plaintiff maintains that "it is entirely within the power of the President to impose a system of tenure for military judges."  Pl. Opp. at 12 (citation omitted).  The point is that neither the President nor Congress have done so, allowing the services to establish their own rules.  Plaintiff continues that "Congress has expressly recognized the President's role with regard to the fitness of military judges in 10 U.S.C. § 806a(a)(requiring uniformity across service lines 'to the

extent practicable')."  Id.  The cited section has to do with the investigation of allegations regarding the fitness of a military judge.  It has nothing to do with the assignment of military judges to their posts.  And in any case, this section only bolsters the government's position that Congress specifically indicated when the services had to be uniform, and when Congress was silent the services are free to promulgate differing regulations.  In addition, the language in 806a(a)contains the caveat "to the extent practicable," indicating Congress' awareness that there are differences among the services which make complete uniformity impossible.

The government explained in its Memorandum that Plaintiff's claim regarding the purported "inter-service disparity" is not wholly accurate.  The judges of the Army and the Coast Guard are subject to the same personnel decisions that Navy judges potentially encounter.  For example, under the Coast Guard regulations, although judges have established 3-year terms of office, they may be removed from their positions "under the normal personnel assignment process based on the needs of the service . . ."  See Exhibit E, App.  Army judges similarly may be removed from office "based on the needs of the service in time of war or national emergency" or "for good cause."  Id.  Therefore, Army and Coast Guard judges serve under terms that may be modified at the discretion of those making personnel decisions in those respective services.[2]

---

[2] Article 26 of the UCMJ places military judges under the authority of the Judge Advocate General, rather than under the authority of the convening officer, and precludes convening authorities from preparing or reviewing any fitness reports of a military judge related to her judicial duties.  10 U.S.C. § 826.  Article 37 of the UCMJ states that no convening authority "may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercises of its or his functions in the conduct of the proceedings."  10 U.S.C. § 837.  Nor may a convening authority attempt to coerce or influence a military judge.  Id.  See also 10 U.S.C. § 898 (making it unlawful and subject to court-martial to intentionally fail to enforce or comply with the procedural obligations under the UCMJ).

Plaintiff responds by arguing that to "accept this contention is to impute to the Army and the Coast Guard acts that were superfluous."  Pl. Opp. at 15 (arguing regulation must be read to have meaning, rather than being "superfluous").  As explained above, despite the differing regulations, each of the services maintains flexibility in its staffing decisions.  Also, this argument contradicts Plaintiff's argument that there is no basis for the purported "disparity."  What follows from Plaintiff's argument is that there are reasons for Navy's decision and for the services to adopt different regulations (because, Plaintiff argues, the differences are not "superfluous").  In fact, the Army and the Coast Guard chose to implement specific regulations with regard to the assignment of judge advocates to be military judges, while the Navy chose instead to rely on its more general officer assignment policies.  See Ex. 1 attached (Navy assignment policy).

Plaintiff also argues that the purported "inter-service disparity" causes service members to be treated differently such that they "do not receive the same measure of judicial independence protection."  Pl. Opp. at 13.  Plaintiff assumes that the purported difference has this effect, an assumption that Weiss calls into question.  Moreover, any difference in the approaches to judicial assignments among the respective services clearly meet this Court's very deferential standard of review.  The same UCMJ articles that ensure the independence of the military judiciary specifically sanction distinctions among the services in authorizing each service Secretary to prescribe regulations for the manner in which military judges are detailed.  10 U.S.C. § 826.  Congress has also sanctioned distinctions between the services in authorizing each Judge Advocate to establish a Court of Criminal Appeals and to prescribe procedural rules for those courts.  10 U.S.C. § 866.

In addition, all service members ultimately have the final protection of recourse to the same Court, the CAAF. Plaintiff fails to cite any authority in arguing that the CAAF "is not a substitute for equal-footing . . . in the services' trial and intermediate appellate courts." Pl. Opp. at 14. In fact, Plaintiff's argument conflicts with <u>Weiss</u>, where the Supreme Court held that the "entire system, finally, is overseen by the Court of Military Appeals, which is composed entirely of civilian judges who serve for fixed terms of 15 years. That court has demonstrated its vigilance in checking any attempts to exert improper influence over military judges." <u>Weiss</u>, 510 U.S. at 181. <u>Weiss</u> explicitly holds that the "entire system" is fair because it is overseen by the CAAF and that military judges (as opposed to the civilian judges on the CAAF) do have sufficient independence to pass Constitutional muster regardless of whether they have fixed terms. "By placing judges under the control of Judge Advocates General, who have no interest in the outcome of a particular court-martial, we believe Congress has achieved an acceptable balance between independence and accountability." <u>Weiss</u>, 510 U.S. at 180.

Plaintiff claims that the government has not identified any "rational basis for the disparity." Pl. Opp. at 15. <u>See also</u> Pl. Opp. at 16 (arguing that rational basis review "may not require much, but . . . the government here has provided nothing"). On the contrary, the government specifically noted in its initial Memorandum the unique needs of the Navy and the potential affect of fixed terms on the Navy's own staffing and military personnel decision making.

Plaintiff also argues at page 15 that, in its initial Memorandum, the Navy failed to distinguish its needs from those of the Army or the Coast Guard. First, the Navy need not articulate an actual, specific reason for the disparity (assuming there is one) between it and the

Army and Coast Guard. All that is required is that there be "any reasonably conceivable state of facts that could provide a rational basis for the classification." FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993).

Second, the potential reasons identified in the government's brief, such as the fluctuating and evolving needs of the Navy, were intended to give the Court but one example of the myriad of conceivable reasons for the alleged "disparity," and to convey to the Court that the Navy has unique staffing needs. This is not to say that the Army and Coast Guard do not have unique staffing needs, but rather that the Navy's needs and decisions are necessarily unique to it because the Navy is a separate military branch, indeed a separate government agency, with a separate mission from the Army, the Coast Guard, or the Air Force. See, e.g., www.dod.gov and www.navy.mil. Each service has its own mix of personnel stationed overseas, at sea on ships, or in the Continental United States and in different places from each other around the globe. www.navy.mil/navydata/fact.asp. Each service has a separate and discrete Judge Advocate General (JAG) Corps, with differing numbers of attorneys and judges, differing ratios of judge advocates to total force levels, and differing numbers of courts martial between the services. Obviously, Navy personnel can be deployed to ships. Thus, the Navy has different staffing and organizational concerns than a primarily land-based force like the Army. The Navy also has separate concerns from the much smaller United States Coast Guard, which, unlike the Navy, is part of the Department of Homeland Security, not the Department of Defense. www.dhs.gov/xabout/structure/index.shtm.

## CONCLUSION

For the foregoing reasons, Defendant's Motion should be granted and Plaintiff's

Complaint should be dismissed with prejudice.

Respectfully submitted,

_____s/Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_____
_____s/Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

_____
_____s/Peter S. Smith_____
PETER S. SMITH, D.C. BAR # 465131
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-0372

Of Counsel:

LCDR Heidi K. Hupp, JAGC, USN
General Litigation Division
Office of the Judge Advocate General
1322 Patterson Avenue Suite 3000
Washington Navy Yard D.C. 20374-5066

13

# MILPERSMAN 1301-104

## OFFICER DISTRIBUTION - GENERAL TOUR LENGTHS AND ROTATIONS

| Responsible Office | CNO (N131) | Phone: | DSN | 223-2303 |
|---|---|---|---|---|
| | | | COM | (703) 693-2303 |
| | | | FAX | 223-1189 |

| References | DODD 1315.7 of 9 Jan 87 |
|---|---|

1. **Policy.** Officer tour lengths are established within the constraints of Office of the Secretary of Defense (OSD) policy, needs of the service, professional career development, and where feasible, the desires of the individual. Other important factors include personnel inventory, number of ships/commands available or projected, future requirements, and fiscal constraints. While appropriate weight is allotted to each of these factors, officer career patterns must also be maintained to ensure development of required Navy leadership and expertise.

   a. Officer tour lengths for overseas (outside continental United States (OCONUS)) assignments are made per Department of Defense (DOD) area tour lengths. These tour lengths are addressed in MILPERSMAN 1300-306.

   b. Basic guidance relating to efficiency, readiness, and permanent change of station (PCS) costs is provided and is integral to all personnel reassignment decision-making:

      (1) The primary reassignment consideration will be an officer's current qualifications to fill a valid requirement and the officer's ability to be productive in that position.

      (2) Qualified volunteers who meet time-on-station (TOS) requirements shall be considered first for any reassignment. The qualified member with the greatest TOS will normally be selected. Qualified non-volunteers who meet TOS will be selected before qualified volunteers without sufficient TOS.

      (3) Careful consideration will be given to permanent change of station (PCS) costs when selecting an officer for an assignment. When other considerations are not overriding, each assignment will be completed with the least expenditure of PCS funds.

(4) Sequential training assignments will be consolidated geographically to the maximum extent practicable.  To minimize impact on the individual's account, sequential training may be performed in a TAD status prior to detaching from the old or after reporting to the new duty station, if the training site is collocated with the old or new duty station.

(5) Reassignments within the continental United States (CONUS) will not be made solely for retirement.

c.  Reduction of personnel turbulence and PCS cost initiatives give tour length adherence high level attention.  Shore tour lengths for career personnel will normally be a minimum of 3 years. Authorized exemptions are listed in paragraph 2 below.  Career development criteria necessitate that some Unrestricted Line (URL) officer warfare specialists will not be toured ashore for excessive periods between sea tours.  As a general policy, shore tours in excess of 36 months for lieutenant commander (LCDR) and below, and 48 months for commander (CDR) and above, are the exception rather than the rule.

2.  **Projected Rotation Date (PRD)**.  Establishment of the PRD will be determined by the detailer/assignment officer at the time orders are issued.

a.  **Establishing a PRD**.  A PRD is generated each time an officer is assigned to a new duty station and represents the month and year in which the rotation of the officer is planned.

(1) PRDs will be established to start the month an officer reports on board the command (CONUS) or the month the officer departs CONUS for an overseas assignment.

(2) PRDs are to be assigned in consonance with existing DOD Directive 1315.7.  Adherence to PRD is defined to be a window 1 month prior to or 3 months after the initially assigned PRD (i.e., that PRD assigned as a result of issuance of PCS orders).  This definition does not apply to initial orders from a training command (including attrites), decommissionings, retirements, resignations, relief for cause, and humanitarian reassignments.

(3) An assigned PRD is a relatively firm date as it forms the basis for the annual PCS funding allocation.  Although it is recognized that there will be some exceptions based on career development requirements and overall needs of the service, these exceptions will be minimal and will be carefully reviewed by Navy Personnel Command (NAVPERSCOM).

b.  **PRD Changes**.  Due consideration is given and liaison

conducted with the placement officer prior to considering a change to a PRD, especially when that change results in a tour being shortened. Close liaison and cooperation between assignment officers and placement officers ensures an orderly turnover of personnel in each activity.

(1) Adherence to PRDs predicated on established tour length policies is considered mandatory.

(2) When these exceptions occur, or in other cases when there is no other alternative, a PRD may be changed to a date outside the previously defined adherence window using the procedures contained in this article.

(3) Requests for adjustments of overseas tours PRDs shall be submitted by letter to NAVPERSCOM. Such requests must contain sufficient information to facilitate an accurate determination. Examples of situations when PRDs require adjustments are as follows:

(a) Correction of erroneous PRDs.

(b) Personnel reporting without family member(s), with movement of family member(s) subsequently authorized.

(c) Family member(s) arriving in a "tourist status" or are newly acquired and subsequently become "command sponsored" family member(s).

(d) Return of family member(s) not at the option of member nor as a result of misconduct.

(e) Member voluntarily elects to serve accompanied tour.

c. **Advancing the PRD** to an earlier fiscal year for a funded PCS move will not normally be granted due to PCS budget considerations.

3. **Officer Rotation of Duty, Afloat and Ashore.** Detailed officer tour length policy guidance is contained in MILPERSMAN 1301-110. The following policy applies to the assignment of personnel from/to billets requiring forward deployments:

a. The goal is to prevent assignment of personnel from a deployed unit to another deployed unit without a reasonable period of time between deployments.

b. Personnel should not be assigned without their consent from one deployable unit to another if the assignment would result in the following:

(1) Forward deployment (greater than 4 months) to be followed

by a forward deployment (greater than 4 months) with less than a 6-month interval between the deployments.

    (2) Forward deployment of more than 6 months out of the most recent 12 months.

   c.  Officer assignment/placement officers verify deployment status for personnel being transferred from one deployable unit to another utilizing Officer Assignment Information System (OAIS) screen A/P-9.  For those assignments requiring the member's consent, assignment officers will log the member's consent in OAIS screen A-25.

4.  **Split Tours**.  Split tours are unprogrammed reassignments within the same geographic location as the present duty station at **no cost** to the government.

   a.  Split tours are applicable to both sea and shore assignments, and must remain consistent with the needs of the service and career development of the individual.

   b.  All split tour requests will be submitted to and approved by the cognizant assignment division director at NAVPERSCOM.

5.  **Tour Extensions**.  On a case-by-case basis, tour extensions at present duty stations for up to a maximum of 1 year may be requested at least 6 months prior to the PRD.

   a.  Approval of tour extensions will be based on a variety of factors such as officer career timing, availability of a relief, and requirements for other priority fills.  Extensions will not be granted to allow officers to avoid their next career milestone.

   b.  Extensions for more than 12 months will be reviewed with caution and approved only under the most unusual circumstances.

   c.  Officers may request tour extensions and adjustments by sending a written request via their chain of command to the appropriate assignment branch, NAVPERSCOM (PERS-4XXX).  The request should contain an explanation and any unusual circumstances that could assist NAVPERSCOM in determining a decision.

    (1) Requests should be submitted 6-12 months prior to PRD or requested tour adjustment date.

    (2) Officers must have completed 1 year at present duty station (for extension, 1-year area tours accepted) prior to submitting requests.

    (3) Reporting senior's endorsement should contain a

recommendation and any pertinent items relating to the reasons for the request.

    d.  All letters of approval for extensions will be caveated so an unforeseen "needs of the service" situation, which would necessitate shortening a previously granted extension could only be viewed as reasonable and understandable by all parties concerned.  Letters of approval of PRD extensions will contain the following caveat:

> "This approval of your tour extension request is based upon a review of your preferences, present billet requirements for officers of your seniority and experience, and your level of professional development.  You may expect reassignment in (month), (year); however, in the event that unforeseen billet requirements arise prior to your new tour completion date, you may be considered for reassignment earlier than currently anticipated.  If shortening of this extension becomes necessary, you will be given as much advance notice as possible in order to lessen the personal impact on you."

6.  **Minimum Tour for Separation (MTS)**.  Having determined that the United States Navy (USN) officer has retainability for a PCS move, notification of intent to issue/issuance of orders obligates the officer for the MTS at the new duty station.

    a.  This is the minimum specified time that the officer shall complete at the new duty station in order to defray the high PCS costs attendant to the move.

    b.  At this point, the emphasis on compliance shifts to completing the DOD or Secretary of the Navy (SECNAV) prescribed tour length (PTL).  MTS requirements are the same as those for retainability contained in MILPERSMAN 1301-108.

7.  **Prescribed Tour Length (PTL)**.  PTLs, as provided in MILPERSMAN 1301-110 are set by SECNAV for sea duty assignment and by DOD for all others.

    a.  PRDs, if set in error, are not an authorization to move an individual prior to completion of the PTL.

    b.  In order to expend PCS funds, either the PTL must be satisfied or appropriate waiver approval must be obtained.

8.  **Attendance at Service Colleges**.  Career officers are screened for service colleges after promotion to 0-4, 0-5, and 0-6, but are assigned as students only after completing current tours of duty.

# MILPERSMAN 1301-110

## OFFICER DISTRIBUTION - PRESCRIBED SEA TOUR AND RECOMMENDED SHORE TOUR LENGTHS

| Responsible Office | CNO (N131) | Phone: | DSN | 223-2303 |
| --- | --- | --- | --- | --- |
| | | | COM | (703) 693-2303 |
| | | | FAX | 223-1189 |

| References | SECNAVINST 7220.75C |
| --- | --- |

1. **Policy.** Assignments to activities identified as **continental United States (CONUS) sea** and **overseas sea** assignments will have full Secretary of the Navy (SECNAV) tours.  These activities are designated by Type Assignment (T/A) Codes "C" and "D."  Assignment to activities identified as CONUS shore and overseas shore are designated by T/A Codes "S" and "O."

   a.  Navy Personnel Command (NAVPERSCOM) division directors are directed to ensure compliance with SECNAV prescribed sea tour (PST) lengths by means of a waiver system similar to the current Department of Defense (DOD) tour management system.

   b.  The following tables depict SECNAV PST lengths as well as recommended shore tour lengths for officers based upon optimum career progression for specific communities.  As such, they represent the required time at sea for officers, but do not constitute exceptions to shore requirements as outlined in MILPERSMAN 1301-104 or overseas tour lengths established by DOD, which are outlined in MILPERSMAN 1300-306.

2. **Prescribed Tour Lengths for Sea Duty**

   a.  An on-time permanent change of station (PCS) move from sea is one that completes the PST length.  A 1-month early window is provided, if required to facilitate the timing of schools, etc.  In cases where an existing projected rotation date (PRD) was incorrectly applied to the sea tour, this does not constitute authority to move an officer early.  Unless other circumstances override, the incorrect PRD is extended.

   b.  A cost PCS move initiates a new PST length.  Sea-to-sea PCS

moves must be no-cost/low-cost (less than $500) to be designated as a split tour and an exception to full PST lengths. Consecutive no-cost/low cost split tours can be combined to meet PST lengths.

c. It is a detailing responsibility to determine if the prescribed tour length criteria has been met prior to a PCS funded move. If not, the assignment officer must obtain waiver approval prior to issuing the orders.

d. NAVPERSCOM assignment division directors are waiver approval authority for SECNAV PST lengths. PST breaks apply to both CONUS and overseas tours. Exception criteria are listed in MILPERSMAN 1301-104.

e. PST waivers are approved as follows:

(1) PST breaks **less than or equal to 6 months, which do not cross the fiscal year,** are approved on a case-by-case basis by the respective NAVPERSCOM division director. Approval authority may be delegated no lower than the NAVPERSCOM branch head level.

(2) PST breaks **greater than 6 months, which cross the fiscal year,** are approved on a case-by-case basis by the respective NAVPERSCOM division director (not to be delegated).

3. <u>**Nuclear Surface Warfare Officer (111X) Tour Lengths**</u>

| Rank | Tour | Description | Sea | Shore | Remarks |
|------|------|-------------|-----|-------|---------|
| ENS LTJG | Initial Sea | Junior Officer | 36-42 | 18 | Nuclear power training/SWOS |
| LT | First Shore | NPTU, NPS, NPGS, Staff, etc. | | 24 | |
| | | SWOS Dept Head Sch | | 6 | |
| | DH/PA Sea | Dept Head, CVN PA | 18-24 | | Conventional and Nuclear. |
| LCDR | Second Shore | DC, Joint | | 18-24 | Nuc Shore if none previous. |
| | Second Sea | XO | 18 | | |
| | Third Shore | DC, Joint | | 24 | |
| CDR | Third Sea | CO | 20 | | |
| CAPT | | CVN Reactor Officer | 24-30 | | Post Command. |
| | Fourth Shore | Shore Staff (NUC) Sequential | | 24-36 | Conform to DOD Area Tour requirements. |
| | Fourth Sea | Major Command | 24 | | |
| WO/LDO | | 61XX, 71XX 64XX, 74XX | 24-36 | 24-36 | Variable with billets. |

## 4.  Submarine Officer (112X) Tour Lengths

| Rank | Tour | Description | Sea | Shore | Remarks |
|------|------|-------------|-----|-------|---------|
| ENS | Input | Nuclear/Submarine Training | | 15 | 3 PCS Moves. |
| | Initial Sea | | 36 | | Two 2-year tours optional. |
| LT | Initial Shore | | | 24-36 | |
| LCDR | Second Sea | Dept Head | 36 | | Two 2-year tours optional. |
| | Second Shore | Post Dept Head | | 24-36 | |
| | Third Sea | XO | 24 | | |
| | Third Shore | Post XO | | 24 | |
| CDR | | PCO | | 6 | |
| | Fourth Sea | CO | 30 | | |
| | Fourth Shore | Post CO | | 24-36 | |
| CAPT | | Major Command | 24 | | |
| WO/LDO | | 62XX, 72XX 640X, 740X | 24-36 | 24-36 | Variable with billets. |

**NOTE:**  All nuclear billets under NAVSEASYSCOM (NAVSEA-08) cognizance will have a 2-year MTS regardless of prior assignment or location.  A minimum 2-year retainability requirement must also be met before assigning an individual to these billets.  This tour length policy will ensure reasonable stability for billets that require special nuclear qualifications and proficiency.

## 5.  Special Warfare Officer (113X) Tour Lengths

| Rank | Tour | Description | Sea | Shore | Remarks |
|------|------|-------------|-----|-------|---------|
| ENS | Input | Core Training (BUD/S) | 9 | | |
| ENS LTJG | Initial Sea | Assistant Platoon Commander/Division Officer | 36 | | |
| LT | Second Sea | Sea Platoon Commander/Dept Head | 24 | | |
| | First Shore | Staff, Tanf Command, PG School | | 24-36 | |
| LCDR | Third Sea | XO of: Seal Team, SBU, SDV, NSWU, other | 25 | | |
| | | Afloat Staff | 24 | | |
| | Second Shore | Joint Duty, Fleet or SOC Staff, Service College | | 24-36 | |
| CDR | Fourth Sea | CO of:  Seal Team, SBU, SDV, NSWU | 24 | | |
| | Third Shore | CO Ashore, Ashore Staff, Service College, Joint Duty | | 24-36 | |

| Rank | Tour | Description | Sea | Shore | Remarks |
|---|---|---|---|---|---|
| CAPT | Fifth Sea | COMNAVSPECWARGRU 1 COMNAVSPECWARGRU 2 COMNAVSPECWARGRU 3 COMNAVSPECWARGRU 4 COMNAVSPECWARDEVGRU | 24 | | |
| | Fourth Shore | COMNAVSPECWARCEN, NSWC Staff, Joint Duty | | 24-36 | |
| NOTE: All Joint Tours are 36 months. | | | | | |

## 6. Special Operations Officer (114X) Tour Lengths

| Rank | Tour | Description | Sea | Shore | Remarks |
|---|---|---|---|---|---|
| ENS | Input | Core Training and Basic Diving Officer | | 7 | Appropriate Billet Specialty Training (BST). |
| | Initial Sea | Div Officer, AOE, ARS, MHC, MCS | 18-30 | | May move when SWO qualified (Avg 24 mo) |
| LTJG | Initial Shore | EOD School, Advance Tactical Training, Jump School | | 14 | Requirement for YG-88 on |
| LT | Second Sea | 1st Dept Head, NSTC EODMU, MDSU | 24-30 | | May rotate upon completion of deployment |
| | Second Shore | OIC Regional Det, EOD Staff, Training Command, NPGS, PEP | | 24-36 | |
| | Third Sea | 2nd Dept Head, EODMU OPS, CAR, PHIB, DESGRU, MCMRON | 24 | | |
| LCDR | Fourth Sea | XO EODMU, MDSU CO, NRFEODMU | 20 | | LCDR XO/CO afloat. May rotate at 18 mo. |
| | Third Shore | XO NEDU, NDSTC EODS, NPGS, Service College | | 20-24 | |
| | Fifth Sea | # FLT AO, EODGRU, Major Staff | 24 | | |
| CDR | Fifth Sea | # FLT AO, EODGRU, Major Staff | 24 | | |
| | Fourth Shore | COCOM AO, XO WEAPSTA, CNO, Service College | | 30-36 | |
| | Sixth Sea | CO EODMU, MDSU NSCT, CSO EODGRU | 24 | | CDR Command |
| CAPT | Fifth Shore | CO SHR EOD/EOM, CNO, ICAF, JNT | | 30-36 | |
| | Seventh Sea | COMEODGRU COMCMRON | 24 | | Major Command |
| | Sixth Shore | CO WPNSTA, CNO Staff, Joint Staff | | 30-36 | Major Command |

### 7.  Human Resources Officer (120X) Tour Lengths

| Rank | Tour | Description | Sea | Shore | Remarks |
|------|------|-------------|-----|-------|---------|
| LTJG LT | Input | | | | Accession via the Lateral Transfer. |
| | Initial Shore | Div Officer, Dept Head Tour, or HR Experience Tour | | 36 | |
| | | Post Grad Education | | 18-21 | |
| LCDR | Second Shore | Experience or Development Tour, XO | | 36 | XO credited tours are 24-36 months. |
| | Third Shore | JPME Phase I, Junior HR Certification | | | |
| CDR | Fourth Shore | Senior Service College, JPME I/II | | | |
| | Fifth Shore | Sequential Experience | | | |
| | Sixth Shore | Commander Command, Senior HR Certification | | | Commander Command Tours are 24-36 months. |
| CAPT | Seventh Shore | HR Exec, Education/Research, Staff Dir, Major Command | | | Major Command Tours are 24 months. |

### 8.  Aviation Officer (13XX) Tour Lengths

| Rank | Tour | Description | Sea | Shore | Remarks |
|------|------|-------------|-----|-------|---------|
| ENS LTJG | Input | Pilot/NFO Training | | | Variable based on community and designator. |
| LT | Initial Sea | Fleet Squadron Tour in warfare specialty | 36-42 | | Exclusive of FRS, variable based on community and designator. |
| | First Shore | TRACOM, FRS, PG School, Staff, CRUITCOM, Washington, etc. | | 24-36 | Variable based on billet. |
| | Second Sea | Squadron, Ship's Company, Embarked Staff | 24 | | Exclusive of FRS. |
| LCDR | Third Sea | Squadron Dept Head | 24-30 | | May be reduced to 24 months or O-5. |
| CDR | Second Shore | Staff, Joint, Washington, Subspecialty | | 24-36 | May be reduced for Command selectees. |
| | Fourth Sea | Command XO/CO | 24-36 | | Variable by community. |
| | Third Shore | Post command | | 36 | Variable based on billet. |
| CDR | Fifth Sea | Ship's Company | 24 | | |
| CAPT | Sixth Sea | Major Command, CV/LHA Command | 18 | | |
| | | Ship's Company, VP Wing Command, CVW | 24 | | |

| | | Command | | | |
|---|---|---|---|---|---|
| | | CVN Command | 36 | | |
| | Fourth Shore | Major Shore Command Minor Shore Command | | 24 | |
| | | Other shore | | 36 | |
| WO/LDO | | 63XX, 73XX | 24-36 | 24-36 | Variable based on billet. |

**NOTES:**
  Tour lengths are guidelines.  Consideration must be given to flight time gates, overseas tour lengths, competitive timing for Department Head Tours, and availability for command.
  Initial sea tours for TACAMO pilots and naval flight officers are 42 months, which allows a first tour pilot to attain Mission Commander qualification and a first tour naval flight officer to fully utilize training for Airborne Communications Officer acquired at mid-tour.
  All other WO/LDO designees will have 36 months at sea/36 months ashore rotation.

9.  **Engineering Duty Officer (14XX) Tour Lengths**

| Rank | Tour | Description | Sea | Shore | Remarks |
|---|---|---|---|---|---|
| CDR and Below | Sea | Engineering Duty | 30 | | |
| | Shore | Engineering Duty | | 36-48 | |
| CAPT | Sea | Engineering Duty | 36-48 | | |
| | Shore | Engineering Duty | | 36-48 | |

10.  **Aerospace Engineering Duty Officer (151X) Tour Lengths**

| Rank | Tour | Description | Sea | Shore | Remarks |
|---|---|---|---|---|---|
| ENS | Input | Pilot/NFO | | | Designators are 131X/132X.  Tour length variable with community and designator. |
| LTJG LT | Initial Sea | Fleet Squadron Tour in warfare specialty | 36-42 | | Designators are 131X/132X.  Exclusive of FRS, tour length variable with community and designator. |
| LT | Initial Shore | TRACOM, FRS, PG School, Staff, Test Pilot School | | 24-36 | Designators are 131X/132X.  Tour length variable with billet. |
| | Second Sea | Squadron, Ship's Company, Embarked Staff | 24 | | Begin tour as 131X/132X. Considered for 1510 community. |
| LCDR | Second Shore | Initial Acquisition Tour, Project Officer:  NAVAIR, SPAWAR, DCMA, NADEP, RDT&E, Warfare CTRS, PG School | | 36 | Assess into 1510 community from 131X/132X as Senior LCDR or Junior CDR. |
| | Second Shore/ | Aviation Dept Head, 2nd Acquisition Tour | 24-36 | 36 | Return for Dept Head Tour or start 2nd |

| | | | | | Acquisition Tour. |
|---|---|---|---|---|---|
| CDR | Third Sea | Senior Level Acquisition DEP Program Manager, Assistant Program Manager | | 36 | |
| CAPT | | Senior Level Acquisition. NAVAIR, SPAWAR, PEO, DPRO CO, TYCOM ACOS as Program Manager, Division Director | | 36 | Variable depending on billet. |

**Note:** CAPT/CDR Tour length may be adjusted to accommodate required training. Acquisition Program Manager Tours may be adjusted to provide continuity through critical milestone accomplishments.

## 11. Aerospace Engineering Duty Officer (152X) (Maintenance) Tour Lengths

| Rank | Tour | Description | Sea | Shore | Remarks |
|---|---|---|---|---|---|
| LT and Below | Sea | Aviation Maintenance Officer | 36 | | |
| | Shore | Aviation Maintenance Officer | | 36 | |
| LCDR CDR | Sea | Aviation Maintenance Officer | 24 | | |
| | Shore | Aviation Maintenance Officer | | 36 | |
| CAPT | Shore | Aviation Maintenance Officer | | 36 | |

## 12. Special Duty Officer (160X) (Information Professional) Tour Lengths

| Rank | Tour | Description | Sea | Shore | Remarks |
|---|---|---|---|---|---|
| LTJG - LCDR LT | Input | Training (IP) Basic | | 6 | IP Basic and Billet Specific Training (BST). |
| | Shore | NCTS Div Off, SUBRON KM, FLT Staff, OPNAV, NNSOC, SSFA, NSA, SPAWAR, DISA, STRATCOM, NCTSI, JIOC | | 24-36 | Complete IP Basic qualification 6 months after IP Basic School. |
| | Sea | CVN Elx Matl, LHA/LHD ADP, LCC Radio, LCC ISO, CPR COMMO | 24 | | |
| | Shore | NAVPGSCOL | | 24-30 | |
| LCDR | Sea | DESRON COMMO | 24 | | Pre-Milestone Sea Opportunity. |
| | | **Milestone Screen** BG COMMO, CVN CISO, LHD ISO | | | Complete IP Intermediate Qualification prior to O-4 Milestone. |

| Rank | Tour | Description | Sea | Shore | Remarks |
|------|------|-------------|-----|-------|---------|
| CDR | Sea | **Milestone Screen** BG Dep N6, BG KM, ESG N6, Nr'd FLT Dep N6, LHA C5 Dept Head, CVN CSO Dept Head | 24 | | |
| | Shore | **Other** White House Comm Agency, Joint C4I Tour, JPME Ph I/II, NNSOC Branch Head, OPNAV, NETWARCOM Staff | | 24-36 | |
| | | **Post-Milestone** CO NCTS, CO DCMS, CO FSSC, CSO NCTAMS, CIT Deputy Dir, IPCOE Dir | | 24 | |
| | Shore Acq. Path | Senior level Acq. Dep PM. APM SPAWAR, Joint C4I/SPACE Acq. | | 24-36 | Complete AP Level 2. |
| CAPT | Sea | **Milestone Screen** BG N6, Nr'd FLT Commander N6 | 24 | | Complete IP Advanced Qualification prior to O-6. |
| | Shore | **Major Command/HQ Staff** NCTS SD, NCTSI Center for IT, OPNAV, JCS, CINC, NETWARCOM, NNSOC | | 24 | |
| | | **Post-Milestone** CO NCTAMS | | 24 | |
| | Shore Acq. Path | Senior level Acq. SPAWAR PM, Joint C4I/SATCOM Dep PM | | 24-36 | |
| WO/LDO | Sea | 619X, 719X | 24 | | Variable with billets. |
| | Shore | 642X, 742X | | 36 | |

## 13.  **Special Duty Officer (161X) (Cryptology) Tour Lengths**

| Rank | Tour | Description | Sea | Shore | Remarks |
|------|------|-------------|-----|-------|---------|
| CDR and Below | Sea | Crypto | 24 | | |
| | Shore | Crypto | | 36-48 | |
| | | Command | | 24 | |
| CAPT | Shore | Crypto | | 36-48 | |
| | | Command | | 24 | |
| WO/LDO | Sea | 644X, 744X | 24 | | |
| | Shore | | | 36 | |

## 14.  **Special Duty Officer (163X) (Intelligence) Tour Lengths**

| Rank | Tour | Description | Sea | Shore | Remarks |
|------|------|-------------|-----|-------|---------|
| ENS | Sea | Intelligence | 24-36 | | |
| LTJG | Shore | Intelligence | | 36 | |

| LT | Sea | Intelligence | 24-30 | | |
| LCDR | Shore | Intelligence | | 36-48 | |
| CDR | Sea | Intelligence | 24 | | |
| | Shore | Intelligence | | 36-48 | |
| CAPT | Sea | Intelligence | 24 | | |
| | Shore | Intelligence | | 36-48 | |
| WO/LDO | Sea | 645X, 745X | 24-30 | | Variable with billets. |
| | Shore | | | 36-48 | |

## 15.  Special Duty Officer (165X) (Public Affairs) Tour Lengths

| Rank | Tour | Description | Sea | Shore | Remarks |
|---|---|---|---|---|---|
| CAPT and Below | Sea | Public Affairs Officer | 24 | | |
| | Shore | Public Affairs Officer | | 36 | |

## 16.  Special Duty Officer (180X) (Oceanography) Tour Lengths

| Rank | Tour | Description | Sea | Shore | Remarks |
|---|---|---|---|---|---|
| ENS thru CDR | Sea | METOC | 24 | | |
| | Shore | METOC | | 36 | |
| CDR | Shore | Command | | 24-36 | |
| CAPT | Shore | METOC | | 36 | |
| | | Command | | 24-36 | |
| WO/LDO | Sea | 646X, 746X | 24 | | Variable with billets. |
| | Shore | | | 36 | |

## 17.  Judge Advocate General Corps Officer (250X/655X) Tour Lengths

| Rank | Tour | Description | Sea | Shore | Remarks |
|---|---|---|---|---|---|
| LT | Sea | | 24-30 | | |
| | Shore | | | 36 | |
| LCDR | Sea | | 24 | | |
| | Shore | | | 36 | |
| CDR | Sea | | 24 | | |
| CAPT | Shore | | | 36-48 | |