UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DARRELL T. OPPERMANN,              )
                                   )
        Plaintiff,                 )
                                   )
   v.                              )   Civil No. 06-1824 (EGS)
                                   )
UNITED STATES,                     )
                                   )
        Defendant.                 )   Judge Sullivan


PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION
TO CROSS-MOTION FOR SUMMARY JUDGMENT

*Argument*

1

The government's claim that Mr. Oppermann has received "full and fair consideration" within the military justice system falls flat. Neither of the military appellate courts heard oral argument; the Court of Appeals for the Armed Forces refused even to permit plenary briefing. And because of the peculiar and indefensible door-blocking effect of a denial of review by that court, he never had access to the only Article III court in the direct appellate chain: the Supreme Court of the United States.

The government argues (at 4) that there is nothing to worry about because, after all, "the military courts previously rejected the same issue presented by Plaintiff in this case in *United States v. Gaines*, 61 M.J. 689 (NMCCA 2005), *affirmed*, 64 M.J. 79 (C.A.A.F. 2006)."[1] This argument has no merit for three reasons. First, the Court of Criminal Appeals never cited *Gaines*.

---

[1] The government's reply mistakenly cites the Court of Appeals for the Armed Forces' grant of review, rather than its subsequent summary affirmance. The summary affirmance in fact appears at 64 M.J. 176.

Second, even if it had, Mr. Oppermann was not a party to that case. And third (and most importantly), to satisfy the "full and fair consideration" test, there must be "full and fair consideration" in the case at hand, not in some other case.

Moreover, even in *Gaines*, the Court of Appeals for the Armed Forces failed to grant review on the equal protection claim. On the only issue it did grant (post-trial delay), *United States v. Gaines*, 64 M.J. 79 (C.A.A.F. 2006) (mem.), it summarily affirmed. 64 M.J. 176 (C.A.A.F. 2006) (mem.). According to the government, that court's failure to grant review renders the equal protection claim ineligible for review by the Supreme Court. *E.g.*, Brief for the United States in Opposition at 6 (S. Ct. cannot review Sixth Amendment claim where C.A.A.F. granted review only on another issue), *McKeel v. United States*, 127 S. Ct. 554 (2006) (denying certiorari).[2]

The government cites (at 4-5) the Navy Court's claim that it "carefully examined" the record and briefs. Def. Ex. F, App. A, at 2. Passing over the fact that the judges of that court are themselves examples of the equal protection violation complained of, such an assertion is a conclusion that in no way absolves this Court of the duty to form its own conclusion as to whether that allegedly "careful examin[ation]" constituted "full and fair consideration." A non-Article III court cannot immunize its own actions from Article III review simply by pronouncing that it has been careful. Where, as here, the operative words of the pertinent part of the lower court opinion are "We disagree, and decline to grant relief," *id*., followed by citation to two cases neither of which addresses the issue at hand, without so much as an explanatory parenthetical,

---

[2] While we do not agree with the government's position as stated in *McKeel*, we know of no case in which the Supreme Court has granted review of an issue as to which the Court of Appeals for the Armed Forces did not grant review. Orders denying certiorari of course do not explain the basis on which a petition is denied.

the talismanic invocation of "careful examin[ation]" simply does not have the effect the Secretary seeks to afford it.

Apparently sensing this, the government goes on to suggest (at 5) that it is of no moment that the two cases on which the Navy Court's impermissibly terse (and legally incorrect) *per curiam* relied antedate the disparity of which Mr. Oppermann complains. The government's effort to tease out a principle is unavailing because it does not answer Mr. Oppermann's objection to say (at 6) that the overall arrangements under the UCMJ "sufficiently preserve judicial impartiality so as to satisfy the Due Process Clause."

The preservation of judicial impartiality, however, is not an all-or-nothing matter. Rather, it is one of degree. For example, a judge blessed with life tenure and protection against diminution in salary, U.S. Const. art. III, § 1, and a judge who serves for a fixed term of years and would need to seek reappointment or re-election in order to remain on the bench both enjoy a measure of independence. But that is a far cry from saying the two measures of protection are the same. The fact that having an at-will judiciary may satisfy the due process component of Fifth Amendment due process therefore says nothing about whether it *also* satisfies the distinct equal protection component of Fifth Amendment due process—an issue that had obviously not arisen, and was therefore not before the Supreme Court and the Court of Appeals for the Armed Forces when they decided *Weiss v. United States*, 510 U.S. 163 (1994), and *United States v. Loving*, 41 M.J. 213 (1994), respectively.

2

Hoping to avoid the need to justify the inter-service disparity of which Mr. Oppermann complains, the government continues to insist (at 9-10) that there is no material difference between the pure at-will regime under which Navy, Marine Corps and Air Force judges serve

3

and the terms of office regime established by the Army and the Coast Guard. That claim is untenable. As Chief Judge (as he then was) Cox of the U.S. Court of Appeals for the Armed Forces observed in his Kenneth J. Hodson Lecture at the Judge Advocate General's School of the Army, "the new Army regulation providing for a fixed term is a giant step forward." Walter T. Cox III, *Echoes and Expectations: One Judge's View*, 159 MIL. L. REV. 183, 201 (1999). Coming, as it did, from a judge who not only served with distinction in the Army and on the state courts, but joined in *United States v. Graf*, 35 M.J. 450 (C.M.A. 1992) (which upheld the constitutionality of at-will military judges), this evaluation of the Army's regulation is entitled to respect.

The government seeks (at 8-9) to finesse the equal protection problem entirely by saying that absent action by the President or Congress, the services may go their separate ways with respect to judicial terms of office under the single statute that has governed military justice for all branches since 1951. The difficulty with this is that the government does not deny that—as we argued—the President can impose a system of tenure for military judges. Because he enjoys that power, under the unitary Executive theory, it is no answer to say that the services are on their own, operating in separate cubicles. Whether the United States government has violated Fifth Amendment equal protection is the issue, and that issue cannot be avoided by segmenting the armed services.[3]

As before, it is not until the reader reaches the very end of the government's brief (at 12)

---

[3] The armed forces' military justice systems are hardly hermetically sealed off from one another. Not only may judges from one service try cases arising in another, Pl. Cross-Motion at 13 & n.20 (citing R.C.M. 201(e)(4), 503(b)(3)), but the military jurors may be from a different branch. R.C.M. 503(a)(3). A member of one service can be put on trial by a commander in another service, R.C.M. 201(e), and may request defense counsel from any branch. R.C.M. 506(b)(1); *United States v. Johnson*, 23 C.M.A. 148, 48 C.M.R. 764 (1974).

that the equal protection merits are finally addressed. The essence of it is that "the Navy's needs and decisions are necessarily unique to it because the Navy is a separate military branch, indeed a separate government agency, with a separate mission from the Army, the Coast Guard, or the Air Force." Everyone knows the Navy has a separate institutional identity and mission. The question is how that separate identity and mission warrant different regimes with respect to the protection of judicial independence.

A different "mix of personnel stationed overseas" (whatever "mix" means in this context) does not fill the bill, since all branches of the armed forces serve outside the United States.

That ships are in the picture adds nothing, as the Coast Guard has many ships and has somehow been able to bring itself to provide the protection of fixed terms of office for its judges.

That the Coast Guard is ordinarily in the Department of Homeland Security instead of the Department of Defense also says nothing about the feasibility of fixed terms of judicial office. That the government would even cite it as a reason is a sign of desperation.[4]

That Navy personnel can be deployed to ships adds nothing; the Coast Guard also at times sends its lawyers to sea. See FY06 Annual Report of the Code Comm. on Military Justice, Report of the Judge Advocate General of the Coast Guard 1 (2006) (50 military attorneys serving in "out-of-specialty" billets, including "commanding and executive officers of cutters"), *available at* <http://www.armfor.uscourts.gov/Annual.htm>.

---

[4] Another sign of desperation is the government's claim (at 7) that the very fact that the Navy changed its mind about whether to provide the protection of fixed terms of office in itself proves that "obviously, the Navy had reasons for its decision." We strongly disagree. Without more, all that a change of mind suggests is that someone made a decision. But the rational basis test looks past the mere existence of a decision to the "rational basis" *for* the decision. To embrace this aspect of the government's reasoning would transform the already favorable (for the government) case law on rational basis into a conclusive presumption simply based on the existence of a government decision—and that is surely not the law.

That the Coast Guard is simply smaller, has more judge advocates per capita, or has fewer personnel deployed overseas thus adds nothing absent some effort to explain, even in principle, why size-of-service or these other factors *per se* renders what is practicable for one service impracticable for another.[5]

To furnish the rational basis needed to survive equal protection scrutiny requires more than dreaming up a list of differences. It requires that there be a connection *in terms of practicability* between the relied-on differences and the different judicial independence regimes under which the President, as Commander in Chief, has permitted them thus far to proceed. The government's mere assertion (at 12) that "the Navy's needs and decisions are necessarily unique to it"—indeed, that *each* of the armed services is unique—without seeking to connect the cited aspects to the practical question of feasibility of modest fixed terms is unworthy of acceptance.

Finally, the extract the government submitted from the Naval Military Personnel Manual in an effort to show that there is no difference between a regime that gives military judges a fixed term of three years and one that relies on normal rotational standards has the ironic effect of demonstrating that there is, in fact, no reason the Navy could not do as the Army and Coast Guard have done. MILPERSMAN 1301-110, table 17 (11 Feb 2004), sets forth the normal tour lengths for officers of the Navy JAG Corps:

17. **Judge Advocate General Corps Officer (250X/655X) Tour Lengths**

| Rank | Tour | Description | Sea | Shore | Remarks |
|------|------|-------------|-----|-------|---------|
| LT | Sea | | 24-30 | | |

---

[5] As pointed out in our opposition to the government's motion to dismiss or, in the alternative, for summary judgment (at 16 n.22), the government abandoned its claim in the military courts that the Navy JAG Corps is smaller than those of the Army and Air Force, yet no less deployable worldwide. *Compare* Def. Ex. C at 6 *with* Def. Ex. D at 4-6. The government has properly not sought to revive that argument. Attempting to do so in a reply brief would be entirely impermissible.

|      | Shore |    |       |
|------|-------|----|-------|
| LCDR | Sea   | 24 |       |
|      | Shore |    | 36    |
| CDR  | Sea   | 24 |       |
| CAPT | Shore |    | 36-48 |

Given these guidelines, it is clear that for Commanders and Captains—who account for all Navy trial and intermediate appellate judges—the Navy already has accommodated itself to tours at least equal to and in some instances longer than the three-year Army and Coast Guard terms of office. The regulation thus disproves the government's claim that there is anything so unique about the Navy's circumstances, personnel "mix," identity, or missions as to render it unfeasible for the Navy to get in step. It is therefore no wonder that the government's "uniqueness" rationale lacks any connection, even in theory, to the essential element of feasibility. A rationale that is at war with an agency's actual practice cannot satisfy the rational basis test. To permit it to do so would make a complete mockery of *Bolling v. Sharpe*, 347 U.S. 497 (1954), one of the great cases of American constitutional law.

*Conclusion*

For the foregoing reasons and those previously stated, Mr. Oppermann's cross-motion for summary judgment should be granted. Oral argument is respectfully requested.

Respectfully submitted,

/s/
EUGENE R. FIDELL (112003)
MATTHEW S. FREEDUS (475887)
FELDESMAN TUCKER LEIFER
  FIDELL LLP
2001 L Street, N.W.
Second Floor
Washington, D.C. 20036
(202) 466-8960

*Attorneys for Plaintiff*

7

March 30, 2007